[Civ. No. 24875. Fourth Dist., Div. One. June 10, 1983.]

RUMAC, INC., Plaintiff and Appellant, v.
ROBERT BOTTOMLEY et al., Defendants and Respondents.

**COUNSEL**

Miller, Boyko & Bell and Robert K. Schraner for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps, Robert G. Steiner and Charles A. Bird for Defendants and Respondents.

**OPINION**

**WIENER,** fn. This appeal[1] involves the scope of that part of Code of Civil Procedure section 2016, subdivision (b) which provides: ". . . any writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories shall not be discoverable under any circumstances."[2]

 Attorney Robert Bottomley (Bottomley) obtained a protective order (§§ 1987.1, 2019, subd. (b)(1)) after the trial court found certain subpoenaed documents were covered by the absolute privilege of section 2016, subdivision (b). Plaintiff Rumac, Inc. (Rumac) appeals from the order contending the privilege does not apply where the lawyer acts merely as the business agent for a client or where the writings are not made in preparation for trial. We conclude otherwise. Neither the text of the statute nor the policy underlying the creation of the absolute privilege warrants a class distinction between the lawyer-negotiator and the lawyer-litigator. There is also no valid reason to differentiate between the writings reflecting the private thought processes of a lawyer acting on behalf of a client at the beginning of a business deal and the thoughts of a lawyer when that business deal goes sour with resultant litigation. We therefore affirm the order.[3]

*Factual and Procedural Background*

Defendant Eugene F. Craig, individually, and San Diego-based Craig Enterprises, Inc. (collectively Craig) and Rumac own two contiguous parcels of land in Anchorage, Alaska, which they leased in 1969 to Royal Inns of Amer-

---

[1] Ordinarily, a discovery order is not appealable. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 65, p. 4079.) Here, because of the nature of the underlying action, we address the issue on the merits and do not decide whether this is an appeal or a petition for a writ of mandate. (See *Barnes* v. *Molino* (1980) 103 Cal.App.3d 46, 50-51 [162 Cal.Rptr. 786].)

[2] All statutory references are to the Code of Civil Procedure.

[3] Although our decision may be of importance to the legal profession, we wish to stress the narrowness of our holding. Bottomley is not a party to the Alaska lawsuit; the trial court was not called upon to consider whether it should give full faith and credit to the Alaska order; the trial court followed the correct procedure in examining the documents *in camera* (see *Fellows* v. *Superior Court* (1980) 108 Cal.App.3d 55, 68 [166 Cal.Rptr. 274]); Rumac does not challenge the correctness of the court's determination that the protected documents are truly writings reflecting Bottomley's "impressions, conclusions, opinions, legal research and theories." Because Craig, Bottomley's former client, is not a party to this appeal, we do not address the extent of an attorney's liability for correctly asserting the absolute privilege against his former client's wishes which proximately causes damages to his former client.

ica. Bottomley represented Craig during the negotiations which culminated in the execution of a long term ground lease by Royal Inns. In 1978 Rumac sued Craig in Anchorage alleging Craig individually entered into a secret side deal with Royal Inns in which he was to receive an additional one percent of the gross room rentals. Rumac contends the revenue from this side agreement constitutes secret profits which should be shared by the parties as joint venturers.

In the Alaska action Rumac sought discovery from Craig of the various documents involved in the transaction including certain papers prepared by and in the possession of Bottomley. Craig refused to produce those documents, asserting the attorney-client and work product privileges. Rumac obtained an order from the Alaska superior court compelling production of the documents. Later, in accordance with the procedure compelling a witness to appear and testify pursuant to a commission by a foreign jurisdiction (§ 2024), Craig noticed Bottomley's deposition in California, serving him with a subpoena duces tecum issued by the San Diego Superior Court. Bottomley moved for a protective order asserting certain of the subpoenaed records and documents were covered by subdivision (b) of section 2016. The motion was opposed by Rumac and Craig. The court granted the motion subject to the court's later *in camera* inspection of the documents in question. ▮ After reviewing the documents the court partially granted Bottomley's request finding some of the documents were protected under section 2016, subdivision (b) because they represented Bottomley's "impressions, conclusions, opinions, legal research and theories." Only Rumac appeals.

*Discussion*

Although there is abundant literature illuminating the history of the section in question, there are surprisingly few reported decisions on the applicability of the absolute privilege to attorneys functioning in a nonadversarial context.[4] Undoubtedly there are many now who would challenge whether the perceived goal of eliminating the "game" element from trials was truly accomplished by the

---

[4]The following decisions discuss the absolute privilege: *Williamson* v. *Superior Court* (1978) 21 Cal.3d 829, 833-834 [148 Cal.Rptr. 39, 582 P.2d 126]; *Shepherd* v. *Superior Court* (1976) 17 Cal.3d 107, 121-122 [130 Cal.Rptr. 257, 550 P.2d 161]; *Watt Industries, Inc.* v. *Superior Court* (1981) 115 Cal.App.3d 802 [171 Cal.Rptr. 503]; *Schlumberger Limited* v. *Superior Court* (1981) 115 Cal.App.3d 386, 393-394 [171 Cal.Rptr. 413]; *Fellows* v. *Superior Court, supra,* 108 Cal.App.3d at pages 61-70; *Popelka, Allard, McCowan & Jones* v. *Superior Court* (1980) 107 Cal.App.3d 496, 500-503 [165 Cal.Rptr. 748]; *Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 647-648 [151 Cal.Rptr. 399]; *Lohman* v. *Superior Court* (1978) 81 Cal.App.3d 90, 100-102 [146 Cal.Rptr. 171]; *City of Long Beach* v. *Superior Court* (1976) 64 Cal.App.3d 65, 80-81 [134 Cal.Rptr. 468]; *American Mut. Liab. Ins. Co.* v. *Superior Court* (1974) 38 Cal.App.3d 579, 593-595 [113 Cal.Rptr. 561]. See also *City and County of San Francisco* v. *Superior Court* (1982) 130 Cal.App.3d 481, 486 [181 Cal.Rptr. 775]; *Insurance Co. of North America* v. *Superior Court* (1980) 108 Cal.App.3d 758, 771 [166 Cal.Rptr. 880, 14 A.L.R.4th 581]; *Merritt* v. *Superior Court* (1970) 9 Cal.App.3d 721, 731 [88 Cal.Rptr. 337].

passage of the Discovery Act in 1957. (Stats. 1957, ch. 1904, pp. 3321-3336.)[5] Nonetheless, the act represented a legislative effort ". . . to expedite the trial of civil matters by allowing litigants an adequate means of discovery during the period of preparation for trial." (*Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 371 [15 Cal.Rptr. 90, 364 P.2d 266]; see also McCoy, *California Civil Discovery—An Introduction* (1966) 41 State Bar J. 519, 521.) In its initial form, section 2016, subdivision (b) permitted the examination of a witness on "any matter, not privileged, which is relevant to the subject matter involved in the pending action," but restricted the scope of the privilege by providing the privilege should not be construed as changing California law "to incorporate by reference any judicial decisions on privilege of any other jurisdiction." (Stats. 1957, ch. 1904, § 3, pp. 3322-3323.) The Legislature decided to reject the work product privilege of *Hickman* v. *Taylor* (1947) 329 U.S. 495 [91 L.Ed. 451, 67 S.Ct. 385].[6] (*Greyhound Corp.* v. *Superior Court, supra,* 56 Cal.2d at p. 401; see McCoy, *California Civil Discovery: Work Product of Attorneys* (1966) 18 Stan.L.Rev. 783, 788-790.) *Greyhound* viewed the "work product rule" as a form of federally created privilege and deferred to the Legislature which had ". . . expressly refused to extend the concepts of privilege when adopting discovery procedures. Since privilege is created by statute it should not be extended by judicial fiat." (56 Cal.2d at p. 401.) Responding to efforts of the organized bar, the Legislature amended the Discovery Act in 1963 by deleting the qualification of the scope of the privilege and adding, "[t]he work product of an attorney shall not be discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing his claim or defense or will result in an injustice, and any writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories shall not be discoverable under any circumstances." (Stats. 1963, ch. 1744, § 1, p. 3478.) In order to assure the work product privilege was fully implemented, the Legislature also said "It is the policy of this state (i) to preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of such cases and (ii) to prevent an attorney

---

[5]Recognizing that the expense of pretrial procedures had driven up the cost of civil litigation, in 1976 the Legislature enacted the Economic Litigation Project (ELP), a pilot program authorizing the Judicial Council to experiment with innovative procedures in certain civil actions. (See §§ 1823-1833; see also Cal. Rules of Court, rules 1701-1859.) In ELP cases, no discovery is permitted (§ 1825) and the parties' right to make pretrial motions is severely limited. (§ 1825.5.) The ELP pilot program terminates on July 1, 1983 (see § 1823.15) and has been replaced by sections 90-100 concerning civil matters in municipal and justice courts. Limited discovery is permitted (see §§ 94, 95) and motions are restricted (§ 92). The Judicial Council has also repealed rules 1701-1759 and 1801-1859 and developed forms for the new Economic Litigation Act. (See News Release No. 10, Admin. Office of the Courts, June 3, 1983.)

[6]The federal attorney work product rule is codified in Federal Rules of Civil Procedure, rule 26(b)(3) (28 U.S.C.). (See fn. 7, *post.*)

from taking undue advantage of his adversary's industry or efforts." (§ 2016, subd. (g).) Uncodified section 3 of the Discovery Act said: "The amendments to this act during the course of its passage shall not constitute evidence that the Legislature intended thereby to limit the courts in their interpretation of what constitutes the work product of an attorney." (Stats. 1963, ch. 1744, § 3, p. 3480.) **(4)** "Accordingly, subdivision (b) affords a conditional or qualified protection for work product generally, and an absolute protection as to an attorney's impressions and conclusions." (*Williamson* v. *Superior Court, supra,* 21 Cal.3d at p. 834; see also *Fellows* v. *Superior Court, supra,* 108 Cal.App.3d at pp. 67-68; *American Mut. Liab. Ins. Co.* v. *Superior Court, supra,* 38 Cal.App.3d at p. 594.)

▮ Interestingly, there is no reference in the legislative background to the loss of the absolute privilege when the attorney's professional skills are limited to negotiating a business deal for a client. In light of the legislative effort devoted to the statute, it is reasonable to believe that had the Legislature intended to limit the privilege to litigation only it would have said so.[7] The Legislature not only failed to provide for any such limitation, but in section 3 declared its intent that the courts were not to be constrained in their interpretation of the attorney's absolute work product privilege. The text of the statute itself is sufficient reason to affirm the trial court order. The rationale of the work product privilege itself is further support for our holding.

The work product privilege provides an incentive for attorneys to maintain the highest professional competence. As the court in *Hickman* v. *Taylor, supra,* 329 U.S. at page 511 [91 L.Ed. at page 462], noted with respect to trial lawyers: "Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. . . . Were [the lawyer's work product] open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served." We strongly believe there is no less need for the lawyer's professional competence in matters unrelated to litigation and observe the California Rules of Professional Conduct make no distinction be-

---

[7]In marked contrast, Federal Rules of Civil Procedure, rule 26(b)(3) (28 U.S.C.), in pertinent part, provides: "Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and *prepared in anticipation of litigation or for trial* by or for another party . . . ." (Italics supplied.)

tween the trial and nontrial lawyer, applying to each with equal force. (See Cal. Rules of Prof. Conduct, rule 6-101.)[8]

Moreover, protecting attorneys' work product when they act in a nonlitigation legal capacity furthers the important goal of reducing the likelihood of litigation. Although all litigators are attorneys, the converse is not true. Nevertheless, "[t]he lawyer, when acting as a *counselor,* performs a function that is extremely beneficial to society, in that effective legal counseling minimizes the likelihood of conflict between parties by stabilizing relationships and promoting understanding and cooperation. Effective legal counselors provide the 'solvents and lubricants which reduce the frictions of our complex society.' In the role of counselor, the lawyer serves as an instrument of peace." (Re, *The Lawyer as Counselor and the Prevention of Litigation* (1982) 31 Cath. U.L.Rev. 685, 690-691, italics in original, fn. omitted.)

Counseling need not have a direct connection to litigated matters. It is the thoughtful and conscientious lawyer carefully examining his or her client's needs in negotiating a transaction who is perhaps best able to avoid or at least reduce the likelihood of litigation. The clear document written concisely and accurately expressing the intent of the parties is obviously the first step in minimizing controversy. The attorney's skill is not only essential to express the terms of the bargain, but the creative lawyer is able to draft appropriate provisions dealing with alternatives to litigation in the event a dispute between the parties does arise. "By seeing to it that the rights and liabilities of the interested parties are clearly stated and understood, the counselor can do much to assure the trouble-free completion of the transaction or course of conduct." (Re, *The Lawyer as Counselor and the Prevention of Litigation, supra,* 31 Cath. U.L. Rev. at p. 694.)[9]

---

[8]We also believe there is no policy reason to distinguish between the attorney claiming the privilege after he produced the work in an earlier trial-related matter (see *Fellows* v. *Superior Court, supra,* 108 Cal.App.3d at pp. 61-63; *Popelka, Allard, McCowan & Jones* v. *Superior Court, supra,* 107 Cal.App.3d at pp. 500-502) and his claiming the privilege after he produced it in an earlier nonlitigated matter.

[9]"Many people have debated whether lawyers exacerbate controversy or help to prevent it from arising. Doubtless, they do some of each. But everyone must agree that law schools train their students more for conflict than for the gentler arts of reconciliation and accommodation. This emphasis is likely to serve the profession poorly. In fact, lawyers devote more time to negotiating conflicts than they spend in the library or the courtroom, and studies show that their bargaining efforts accomplish more for their clients. Over the next generation, I predict, society's greatest opportunities will lie in tapping human inclinations toward collaboration and compromise rather than stirring our proclivities for competition and rivalry. If lawyers are not leaders in marshaling cooperation and designing mechanisms that allow it to flourish, they will not be at the center of the most creative social experiments of our time." (Bok, *A Flawed System* (May-June 1983) Harvard Magazine, 38, 45; see also Re, *The Lawyer as Counselor and the Prevention of Litigation, supra,* 31 Cath. U.L.Rev. at pp. 696-697.)

Our discussion has proceeded on the premise that the privilege extends to the lawyer only when he or she is acting *qua* lawyer. Obviously there are occasions when a lawyer may act merely as a business agent receiving or conveying messages. Under those limited circumstances the absolute privilege will not apply. (See *Watt Industries, Inc.* v. *Superior Court, supra,* 115 Cal.App.3d 802.) Here, the complexity of the transaction and the services which Bottomley was called upon to perform were found by the court to be services requiring Bottomley's professional skill and knowledge. Accordingly, this case does not fall within the narrow holding of *Watt.*

*Disposition*

Order affirmed.

Cologne, Acting P. J., and Staniforth, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 17, 1983.